UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


PATRICIA SMITH,
        Plaintiff,


        v.                                           CIVIL ACTION NO.
                                                     14-14027-MLW

CLAY CHEVROLET, INC. d/b/a
CLAY HYUNDAI,
        Defendant.


**REPORT AND RECOMMENDATION RE:**
**DEFENDANT CLAY CHEVROLET'S MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 20)**

**November 17, 2016**

**BOWLER, U.S.M.J.**

        Pending before this court is a motion for summary judgment
filed by defendant Clay Chevrolet, Inc. ("defendant").  (Docket
Entry # 20).  Patricia Smith ("plaintiff") opposes the motion.
(Docket Entry # 33).  After conducting a hearing, this court
took the motion (Docket Entry # 20) under advisement.

PROCEDURAL BACKGROUND

        Plaintiff filed a first amended complaint against defendant
(Docket Entry # 1-1) ("the complaint") setting out the following
causes of action in violation of Massachusetts General Laws
chapter 151B ("chapter 151B"):  (1) discrimination in the form
of disparate treatment on the basis of "national

origin/race/color/ethnicity" and harassment (Count I); (2)

retaliation for reporting about or resisting discrimination on

the basis of race or, more globally, "national

origin/race/color/ethnicity" (Count II);[1] (3) sexual harassment

in the form of a hostile work environment (Count III); (4)

discrimination in the form of disparate treatment on the basis

of "sex/gender" (Count IV); and (5) retaliation for reporting

the sexual harassment, "sex/gender" discrimination and

harassment as well as other discrimination (Count V).  (Docket

Entry # 1-1).[2]

    With respect to Count I, it includes a number of different

claims.  Paragraph seven of the complaint, which Count I

incorporates, alleges that, "Plaintiff was discriminated against

by the Defendant based on her national origin, race, color,

ethnicity and sex/gender and she was sexually harassed."

(Docket Entry # 1-1, ¶ 7).  Specific to Count I, the complaint

alleges that plaintiff was treated differently "based upon her

---

[1]  At the hearing, plaintiff's counsel wisely agreed to concede
the merits of defendant's arguments on Count II.

[2]  In the memorandum in opposition to defendant's summary
judgment motion, plaintiff argues that defendant is not entitled
to summary judgment with respect to gender discrimination under
"Title VII" as well as under chapter 151B.  (Docket Entry # 33,
pp. 18, 22).  The complaint, however, fails to refer to Title
VII and the causes of action are framed exclusively as chapter
151B violations.  In the event plaintiff wants to include a
Title VII claim(s), it is incumbent upon her to file a motion
for leave to amend the amended complaint.  This court expresses
no opinion on the merits or timeliness of such a motion.

national origin/race/color/ethnicity and was subjected to discrimination and harassment." (Docket Entry # 1-1, ¶¶ 17, 18). It also includes a brevis hostile work environment allegation based on national origin/race/color/ethnicity (Docket Entry # 1-1, ¶ 21) that plaintiff fails to develop in her opposition.[3]

Defendant's summary judgment motion seeks summary judgment "on all claims" and summarizes those claims to include claims that plaintiff "was subjected to disparate treatment and a hostile work environment on the basis of her . . . national origin, . . ., color, and ethnicity." (Docket Entry # 20) (Docket Entry # 21, p. 1). In response, plaintiff's opposition does not address a hostile work environment claim based on race, color, national origin or ethnicity. In opposing defendant's summary judgment motion, plaintiff also fails to address a disparate treatment claim based on "color" separate and apart from the claim based on her race. In the MCAD charge, plaintiff grouped the categories of race and color together, alleging discrimination" on the basis of "race/color." (Docket Entry # 22-12). In addition, the MCAD charge does not reference either ethnicity or national origin and the complaint does not identify plaintiff's Dominican descent. Accordingly, given these

---

[3] She does mention the allegation in passing. (Docket Entry # 33, p. 10).

circumstances, plaintiff waived the hostile work environment claims, if any, based on race, color, ethnicity and national origin.[4]  She also waived any disparate treatment discrimination claim in the complaint based on her "color."  See Gordon v. Massachusetts Bay Transp. Auth., 2014 WL 5464093, at *1 (D.Mass. Oct. 28, 2014) (although retaliation "theory" was "articulated in" complaint, plaintiff's brief" opposing "defendants' summary judgment motion ignored that theory" and, given that omission, "any claim of retaliation" is waived), appeal dismissed, (1st Cir. Sept. 3, 2015) (No. 14-2213); accord Vallejo v. Santini-Padilla, 607 F.3d 1, 7 & n.4 (1st Cir. 2010) ("[p]laintiffs have not cited a single authority in support of their assertion that their failure to timely oppose the motion to dismiss did not constitute waiver" and noting that "[p]laintiffs did not properly raise their arguments below"); accord Coons v. Industrial Knife Co., Inc., 620 F.3d 38, 44 (1st Cir. 2010) ("district court was 'free to disregard' the state law argument that was not developed in Coons' brief"); see also Merrimon v. Unum Life Ins. Co. of America, 758 F.3d 46, 57 (1st Cir. 2014) ("'[e]ven an issue raised in the complaint but ignored at summary judgment may be deemed waived'").  Accordingly, what

---

[4]  Because defendant addresses the hostile work environment claim based on race in the supporting memorandum (Docket Entry # 21, p. 14), this court addresses it infra to complete the record even though it is, in the alternative, waived.

remains in Count I are disparate treatment discrimination claims based on race, ethnicity and national origin.

In light of the concession as to Count II, the only retaliation claim is based on the reporting of the sexual misconduct set out in Count V.  As to counts III and IV, respectively captioned "sexual harassment" and "sex/gender discrimination and harassment," the MCAD charge included both forms of sex discrimination (harassment and disparate treatment).  Paragraph seven of the complaint also alleges that plaintiff was discriminated against on the basis of her "sex/gender and she was sexually harassed."  (Docket Entry # 1-1, ¶ 7).  The complaint therefore raises both a claim for "sex/gender discrimination," as stated in the caption of Count IV, and a claim for "sexual harassment," as stated in the caption of Count III.  Plaintiff's opposition addresses each claim (Docket Entry # 33, ¶¶ IV, V) such that plaintiff did not waive either claim.  Defendant's argument that the claims in Counts III and IV are synonymous and only raise a claim for a hostile work environment (Docket Entry # 21 n.2) is therefore misplaced.

### STANDARD OF REVIEW

Summary judgment is designed "to 'pierce the boilerplate of the pleadings and assay the parties' proof in order to determine whether trial is actually required.'"  Tobin v. Federal Express

Corp., 775 F.3d 448, 450 (1st Cir. 2014) (quoting Wynne v. Tufts
Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992)).  It is
appropriate "if the movant shows that there is no genuine
dispute as to any material fact and the movant is entitled to
judgment as a matter of law." Fed.R.Civ.P. 56(a).  It is
inappropriate "if the record is sufficiently open-ended to
permit a rational factfinder to resolve a material factual
dispute in favor of either side." Pierce v. Cotuit Fire Dist.,
741 F.3d 295, 301 (1st Cir. 2014).

    "Genuine issues of fact are those that a factfinder could
resolve in favor of the nonmovant, while material facts are
those whose 'existence or nonexistence has the potential to
change the outcome of the suit.'" Green Mountain Realty Corp.
v. Leonard, 750 F.3d 30, 38 (1st Cir. 2014) (quoting Tropigas de
Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London,
637 F.3d 53, 56 (1st Cir. 2011)).  The evidence is viewed "in the
light most favorable to the non-moving party" and "all
reasonable inferences" are drawn in her favor. Ahmed v.
Johnson, 752 F.3d 490, 495 (1st Cir. 2014).  In reviewing a
summary judgment motion, a court may examine "all of the record
materials on file including depositions, documents,
electronically stored information, affidavits or declarations .
. . or other materials." Fed.R.Civ.P. 56(c)(1); see Ahmed v.
Johnson, 752 F.3d at 495.  "Unsupported allegations and

speculation," however, "do not demonstrate either entitlement to summary judgment or the existence of a genuine issue of material fact sufficient to defeat summary judgment." <u>Rivera-Colón v. Mills</u>, 635 F.3d 9, 12 (1st Cir. 2011); <u>see</u> <u>Serra v. Quantum Servicing, Corp.</u>, 747 F.3d 37, 39-40 (1st Cir. 2014) ("allegations of a merely speculative or conclusory nature are rightly disregarded").

Defendant filed a LR. 56.1 statement of undisputed facts. Uncontroverted statements of fact in the LR. 56.1 statement comprise part of the summary judgment record.[5] <u>See</u> <u>Cochran v. Quest Software, Inc.</u>, 328 F.3d 1, 12 (1st Cir. 2003) (plaintiff's failure to contest date in LR. 56.1 statement of material facts caused date to be admitted on summary judgment); <u>Stonkus v. City of Brockton Sch. Dep't</u>, 322 F.3d 97, 102 (1st Cir. 2003) (citing LR. 56.1 and deeming admitted undisputed facts material facts which plaintiff failed to controvert).  Adhering to this framework, the record sets out the following facts.[6]

FACTUAL BACKGROUND

A.  <u>Plaintiff's Employment</u>

Prior to her employment at defendant's dealership, plaintiff worked as a waitress and had no prior experience in

---

[5]  Statements of law in the statement of undisputed facts are not considered.
[6]  Additional facts are included in the discussion section where relevant to a particular argument.

automobile sales.  (Docket Entry # 22, ¶ 11, p. 3) (Docket Entry
# 32, ¶ 11, p. 3).[7]  On July 27, 2012, plaintiff, who is Hispanic
and of Dominican descent, was hired as a salesperson at
defendant's automobile dealership in Norwood, Massachusetts,
Clay Hyundai.  (Docket Entry # 22-6, p. 2) (Docket Entry # 22,
¶¶ 9, 10, p. 3) (Docket Entry # 32, ¶¶ 9, 10, p. 3).

    As stated in its employee handbook, defendant:

    is an equal opportunity employer.  All employment
    decisions and personnel actions at the [defendant's
    company] are administered without regard to race,
    color, religion, creed, national origin, ancestry, sex
    . . .  All employment decision and personnel actions,
    such as hiring, promotion, compensation, benefits, and
    termination, are and will continue to be administered
    in accordance with, and to further the principle of,
    equal employment opportunity.

(Docket Entry # 22-1, p. 3).

    Additionally, defendant's freedom from harassment policy
states, "All employees have the right to be free from slurs or
any other verbal or physical conduct that constitutes such
harassment."  (Docket Entry # 22-1, p. 3).  The policy provides
that any employee who believes that he or she is the victim of
workplace harassment should promptly report the act to the
employee's manager.  (Docket Entry # 22-1, p. 3).  Additionally,
defendant has an anti-fraternization policy.  (Docket Entry #
32, ¶ 95, p. 19).

---

[7]  Page numbers refer to the page as docketed rather than the
page of the document itself.

Salespeople at Clay Hyundai typically announced their sale goals during weekly Saturday meetings, but there was no required quota. (Docket Entry # 22-7, p. 17). Sales leads were received via defendant's business development center ("BDC"), which was located adjacent to defendant's dealership. (Docket Entry # 22, ¶¶ 16-18, p. 4) (Docket Entry # 32, ¶¶ 16-18, p. 4). At the BDC, employees communicated with potential customers and set up appointments to visit the dealership. (Docket Entry # 22, ¶¶ 16-20, p. 4) (Docket Entry # 32, ¶¶ 16-20, p. 4). Salespeople were expected to approach customers who visited the dealership without a prior appointment scheduled through the BDC. (Docket Entry # 22, ¶¶ 19-20, p. 4) (Docket Entry # 32, ¶¶ 19-20, p. 4). These customers were referred to as "ups." (Docket Entry # 22, ¶ 19, p. 4) (Docket Entry # 32, ¶ 22, p. 4). The number of "ups" a salesperson took was recorded in a computer tracking system at the dealership. (Docket Entry # 22, ¶ 22, p. 5) (Docket Entry # 32, ¶ 22, p. 4). The BDC also received telephone and online inquiries from potential customers and assigned those potential customers to salespeople. (Docket Entry # 22-5, p. 2).

At the beginning of her employment, plaintiff's sales were lower than average because she had no prior experience in automobile sales. (Docket Entry # 22, ¶ 13, p. 3) (Docket Entry # 32, ¶ 13, p. 3). She sold five, three and six cars during the

months of August, September and October 2012 respectively.
(Docket Entry # 22-8, p. 2).  Her sales increased during 2013
but then decreased in the winter of 2014.  (Docket Entry # 22-8,
p. 2).  Construing the record in plaintiff's favor, she sold
seven, seven and eight cars during the months of January,
February and March 2014 respectively.  (Docket Entry # 22, ¶ 66,
p. 11) (Docket Entry # 22-11).  Comparatively, the median sales
in January, February and March 2014 were eight, seven and six
cars.  (Docket Entry # 22-11).  During this three-month time
period there were only four instances in which a salesperson
sold more than ten cars.  (Docket Entry # 22-11).  Plaintiff
took less ups than the average salesperson during the winter of
2014.  (Docket Entry # 22-5, p. 4).  According to plaintiff's
manager, Jason Ferreira ("Ferreira"), plaintiff's employment was
terminated due to "poor performance" stemming from her refusal
to take sufficient "ups" as they came in.  (Docket Entry # 32-3,
pp. 8-9).

B.  Jason Ferreira

On January 3, 2014, Ferreira was hired as the general
manager of defendant's dealership.  (Docket Entry # 22-5, ¶ 2,
p. 2).  Ferreira was hired to improve operations at the BDC.
(Docket Entry # 22-5, ¶ 5, p. 2).  Ferreira initially terminated
the existing sales manager, Mike Rice, and hired two new
employees, DJ Allain ("Allain") and Frank Bisch.  (Docket Entry

10

# 22, ¶ 26, p. 5).   Ferreira subsequently transferred Allain to
a finance position occupied by plaintiff's step-father, Edwin
Espinoza ("Espinoza"), who was terminated as a result of the
transfer.  (Docket Entry # 32, ¶ 27, p. 5).   Ferreira's
friendship with Allain predates Allain's placement in the
finance position.  (Docket Entry # 32, ¶ 27, p. 5).

With respect to plaintiff, Ferreira states in his affidavit
that plaintiff was "generally good at closing sales.  However,
she routinely took fewer ups than average."  (Docket Entry # 22-
5, ¶ 22, p. 4).   Ferreira counseled plaintiff to more frequently
approach new customers.  (Docket Entry # 22-5, ¶ 23, p. 4).
Plaintiff, however, states by affidavit that it was never
brought to her attention that she needed to improve her
performance.  (Docket Entry # 22-7, p. 16).

Ferreira often used profanities in front of plaintiff,
other employees and customers during meetings and in the
showroom.  (Docket Entry # 22-7, p. 53) (Docket Entry # 27, pp.
86-87).  Plaintiff suggests that Ferreira directed profanities
at her "about seven times while in the office."  (Docket Entry #
32-5, ¶ 4, p. 3).

For example, on two occasions, Ferreira made comments
towards plaintiff regarding her Hispanic and Dominican descent.
(Docket Entry # 22-7, pp. 34-35) (Docket Entry # 32, ¶¶ 29-30,
p. 6).  One evening, plaintiff stayed at the dealership late and

informed Ferreira that she would lock the door upon leaving. (Docket Entry # 22, ¶ 29, p. 6) (Docket Entry # 32, ¶ 29, p. 6). Ferreira responded, "Don't lock the door, because I know how you Spanish people are, stealing stuff." (Docket Entry # 22, ¶ 29, p. 6) (Docket Entry # 32, ¶ 29, p. 6). In another instance, when plaintiff got coffee for Ferreira and the owner of the dealership, Brian Clay ("Clay"), Ferreira responded, "I won't drink that. I don't trust Spanish people. You put stuff [i]n the drink." (Docket Entry # 22, ¶ 30, p. 6) (Docket Entry # 32, ¶ 30, p. 6). These were the only comments Ferreira made about "'Spanish people.'" (Docket Entry # 22, ¶ 31, p. 6) (Docket Entry # 32, ¶ 31, p. 6). Plaintiff never heard anyone else at the dealership make any derogatory comments about Spanish or Dominican people. (Docket Entry # 22, ¶ 33, p. 6) (Docket Entry # 32, ¶ 33, p. 6).

Plaintiff did not report these comments but contends that Clay was present on one occasion and Espinoza was present for another. (Docket Entry # 22-7, pp. 33-36). Ferreira states by affidavit that he "never made any derogatory comments towards [plaintiff] or anyone else regarding 'Spanish people' or any other race or ethnicity." (Docket Entry # 22-5, ¶ 32, p. 5).

Additionally, Ferreira developed an extramarital relationship with Jillian Kivlin ("Kivlin"), a "BDC agent" who began working at the dealership in early January 2014. (Docket

Entry # 22, ¶¶ 39-54, pp. 7-9) (Docket Entry # 22-7, p. 55)
(Docket Entry # 32, ¶¶ 39-54, pp. 7-9).  Although Ferreira never
made any sexual advances towards plaintiff, plaintiff states by
affidavit that Ferreira's relationship with Kivlin interfered
with her ability to perform her duties at the dealership.
(Docket Entry # 32-4, p. 10).  Plaintiff needed a sales manager
to sign off on her sales (Docket Entry # 22-7, pp. 52) and
Ferreira was often occupied or unavailable.  (Docket Entry # 22-
7, pp. 30-31, 38, 38-39, 40, 41, 46, 51).

For example, on one occasion plaintiff attempted to speak
with Ferreira about a potential customer but the BDC door where
Ferreira was located at the time was locked.  (Docket Entry #
22, ¶ 46, p. 8) (Docket Entry # 32, ¶ 42, p. 7).  When Ferreira
opened the door, plaintiff "observed that the crotch of his
pants appeared to be wet and [Ferreira] was zipping up his fly .
. . [and] Kivlin fixing her clothes."  (Docket Entry # 22, ¶ 46,
p. 8) (Docket Entry # 32, ¶ 42, p. 7).  Plaintiff informed
Ferreira that, "'I have some customers that need you.'"  (Docket
Entry # 22-7, p. 42).  However, the customers ultimately left
without speaking to Ferreira or purchasing a car.  (Docket Entry
# 22-7, p. 42).  Anywhere from two-to-three times per day and 15
minutes to two hours at a time, Ferreira and Kivlin remained
behind locked doors.  (Docket Entry # 32, ¶ 50).

On a number of occasions, plaintiff observed Kivlin "[wait]

outside in front of the dealership while [Ferreira] went to get his car.  [Kivlin] would get into the passenger side of [Ferreira's] car and then lower the seat all the way down, so it appeared that only [Ferreira] was in the car." (Docket Entry # 22, ¶ 44, p. 8) (Docket Entry # 32, ¶ 44, p. 7).  Also, Ferreira and Kivlin often remained at the dealership after hours. (Docket Entry # 22, ¶ 45, p. 8) (Docket Entry # 32, ¶ 45, p. 7). Plaintiff states by affidavit that Ferreira stated, "[g]et the fuck out, everybody.  I'm fucking locking the door," and all of the salespeople would leave except for Kivlin.[8]  (Docket Entry # 22-7, p. 62).  On another occasion, plaintiff observed Kivlin sitting at her desk with her back towards her computer and Ferreira behind the closed door.  (Docket Entry # 22, ¶ 48, p. 8) (Docket Entry # 32, ¶ 50, p. 8).  Plaintiff also witnessed Ferreira and Kivlin go into the ladies restroom together on a number of occasions.  (Docket Entry # 22, ¶ 49, p. 8) (Docket Entry # 32, ¶ 49, p. 8).

During one instance, plaintiff found and returned Kivlin's purse in Ferreira's demo car.  (Docket Entry # 22, ¶ 54, p. 9) (Docket Entry # 32, ¶ 54, p. 9).  Kivlin then entered Ferreira's

---

[8]  Plaintiff's recitation about what Ferreira said and the profanity he used is not considered for the truth of the matter asserted.  See Tuli v. Brigham & Women's Hosp., 656 F.3d 33, 41 (1st Cir. 2011) (statements not admitted for the truth of the matter asserted but "for purposes of showing notice to the Hospital and toleration of a general climate of offensive remarks and displays").

office and shortly thereafter Ferreira entered the showroom and screamed in front of plaintiff, employees and customers, "Until you see my dick inside of her vagina, nobody can say I'm fucking her."[9]  (Docket Entry # 22, ¶ 54, p. 9) (Docket Entry # 32, ¶ 54).  Plaintiff nevertheless states by affidavit that Ferreira admitted and even bragged about having sexual intercourse with Kivlin, despite being married to another woman.  (Docket Entry # 22-7, pp. 47-48).  Conversely, Ferreira states by affidavit that he did not have sexual relations with Kivlin during his employment at Clay Chevrolet, but in his deposition he admits to entering into a relationship with Kivlin after he was terminated.  (Docket Entry # 22-5, ¶ 31, p. 5) (Docket Entry # 32-3, p. 5).  Plaintiff complained to Ferreira that it was inappropriate to have sex in the workplace and that his sexual behavior behind locked doors impacted her ability to do her job.  (Docket Entry # 32, ¶ 84, p. 15).

In or around March of 2014, plaintiff first reported her discomfort with a suspected sexual relationship between Ferreira and Kivlin to Chief Financial Officer James Sarno ("Sarno").  (Docket Entry # 32-4, p. 10) (Docket Entry # 32-2, p. 7).  The human resources coordinator, Sharon Waterson ("Waterson"), was out of the office on medical leave and so Sarno was standing in

---

[9]  This statement is not considered for the truth of the matter asserted.

as HR for the time Waterson was out.  (Docket Entry # 32-2, p. 6).  Plaintiff met Sarno face-to-face and conveyed her belief that Ferreira was involved in a sexual relationship with Kivlin, that his behavior was inappropriate and that his unavailability hindered her sales capacity.  (Docket Entry # 22, ¶ 55, p. 9) (Docket Entry # 32-4, p. 10).  Sarno responded by indicating that "just because they are behind a locked door doesn't mean there is something sexual" and suggested he would report up to Clay, who hired Ferreira.  (Docket Entry # 32-4, p. 11).  Sarno did not take notes at the meeting with plaintiff even though he agreed that it would have been important to do so.  (Docket Entry # 32-4, p. 11).  Sarno then discussed the matter with Clay.  (Docket Entry # 32-4, p. 12).  Thereafter, Clay had a meeting with Ferreira who denied the allegations to Clay. (Docket Entry # 22-5, ¶ 30, p. 5).  Within a day of this conversation, Sarno relayed to plaintiff that Ferreira had been spoken to and denied any sexual relationship with Kilvin. (Docket Entry # 22, ¶ 62, p. 10) (Docket Entry # 32, ¶ 62, p. 10) (Docket Entry # 32-4, p. 14).[10]

Next, plaintiff approached her Clay Hyundai office manager, Crystal Wall ("Wall"), to report her discomfort with Ferreira's unavailability behind locked doors with Kilvin, in addition to

---

[10]  The parties agree that the above fact is part of the summary judgment record.

her reporting "an inappropriate relationship" between them. (Docket Entry # 32-2, p. 6).  Wall indicated she would look into the matter and contacted Sarno.  (Docket Entry # 32-2, p. 6). Wall did not take any notes of her conversation with Sarno, but shortly thereafter plaintiff's employment ended.  (Docket Entry # 32-2, p. 6).

After plaintiff confronted Clay and towards the end of her employment, plaintiff stated "she was taking herself out" if she fell short of her sales goal.  (Docket Entry # 32-2, p. 7). Also, after plaintiff had complained to Wall that Ferreira once looked directly at her and stated, "'I don't give a fuck who you are.  I can fucking fire any of you any time I want.  I don't give a fuck you go and talk to the [sic] Clay.  I do anything I fucking want in this place.'"  (Docket Entry # 22, ¶ 64, p. 11) (Docket Entry # 32, ¶ 64, p. 11) (Docket Entry # 22-7, p. 59).

After plaintiff's complaints, Ferreira refused to speak with plaintiff, and neither Ferreira nor the BDC assisted plaintiff in her sales efforts.  (Docket Entry # 22-7, p. 47). In her capacity at the BDC, Kivlin was responsible for providing sales leads to sales staff, but following plaintiff's complaints, plaintiff did not receive any referrals.  (Docket Entry # 32-1, p. 10).  Ferreira was more accommodating to other employees, because, in plaintiff's words, the other employees "didn't care" about his extracurricular work activities.

17

(Docket Entry # 22-7, pp. 52-53).  Customarily, when a
salesperson greeted a customer at the door (whether they were
there for a BDC appointment or not) that customer would be
counted as an "up" for the salesperson who would be entitled to
serve that customer.  (Docket Entry # 32-5, ¶ 10, p. 3).
Roughly three to four times per week, plaintiff would initiate
contact with a customer headed to the BDC, but that customer
would be reassigned to other sales staff at the behest of
Ferreira.  (Docket Entry # 32-5, ¶ 10, p. 3).  Kivlin did not
often assign plaintiff customers from online and phone sales
leads as most customers were assigned to salesperson Eddy, a
friend of Ferreira and Kivlin, who provided Kivlin with rides to
work.  (Docket Entry # 32-5, ¶ 11, p. 4).

    Plaintiff submits that she was required to get final
approval on sales from Ferreira, who after plaintiff's
complaints often turned away sales.  (Docket Entry # 32-5, ¶ 12,
p. 4).  This rarely occurred prior to plaintiff's complaints and
Ferreira was more helpful to sales staff who had not complained
about his sexual behavior.  (Docket Entry # 32-5, ¶¶ 12, 13).

C.  Termination

    On April 18, 2014, plaintiff went to work and, upon
learning that Waterson had returned to work, went to her office
and began describing there "was too much sex harassment going on
between" Ferreira and Kivlin.  (Docket Entry # 32-1, p. 29).

18

While plaintiff was in Waterson's office, plaintiff received a page from Ferreira.  Plaintiff responded to the page and went to his office.  (Docket Entry # 32-1, pp. 29-30).  When plaintiff saw Ferreira, he terminated her employment.  (Docket Entry # 22, ¶ 68, p. 12) (Docket Entry # 32, ¶ 68) (Docket Entry # 22-5, ¶ 36, p. 5).  Ferreira fired plaintiff "for performance reasons." (Docket Entry # 22-2, ¶ 26, p. 5) (Docket Entry # 22-5, ¶ 36). Ferreira informed plaintiff she was terminated because of poor performance, including not selling enough cars.  (Docket Entry # 32-3, p. 13).  Ferreira told plaintiff that "it's nothing personal, but you knew it was coming.  You're not taking enough up[s].  I have to let you go."  (Docket Entry # 22, ¶ 69, p. 12) (Docket Entry # 32, ¶ 69, p. 12).  Plaintiff was reputed to be polite and a good salesperson.  (Docket Entry # 32-4, pp. 8, 11).  Sarno could not recollect any instance where plaintiff received a verbal or written warning.  (Docket Entry # 32-4, p. 8).  Ferreira never issued plaintiff "[a] specific warning saying if she didn't do X amount that she was gone."  (Docket Entry # 32-3, p. 9).  There was no sales quota at the dealership, however, sales people did set a goal for themselves each month.  (Docket Entry # 32-2, p. 11).

On April 8, 2014, the lowest performing salesperson, Tracy McNeil, was terminated for "no call, no show."  (Docket Entry # 22, ¶ 70, p. 12) (Docket Entry # 32, ¶ 70, p. 12) (Docket Entry

19

# 22-5, ¶ 38, p. 5).  On May 27, 2014, Ferreira hired another salesperson, Rich Garcia ("Garcia"), also of Dominican descent. (Docket Entry # 22, ¶ 72, p. 12) (Docket Entry # 32, ¶ 72, p. 12).  Subsequently, on June 2, 2014, Ferreira fired Paul Shamon ("Shamon"), a white male with higher sales figures than plaintiff.  (Docket Entry # 22, ¶ 71, p. 12) (Docket Entry # 32, ¶ 71, p. 12).  Shamon never complained about discrimination or Ferreira's relationship with Kivlin.  (Docket Entry # 22, ¶ 71, p. 12) (Docket Entry # 32, ¶ 71, p. 12).

On October 14, 2014, defendant terminated Ferreira. (Docket Entry # 22-5, ¶ 43, p. 6).  Ferreira contends the reason for his termination was the anticipated slow winter season. (Docket Entry # 32-3, p. 6).

## DISCUSSION

Defendant seeks summary judgment on all claims in the complaint.  Plaintiff argues that summary judgment is inappropriate given persisting issues of material fact.  (Docket Entry # 33).

## A. Race, National Origin, Ethnicity and Gender Discrimination (Counts I and IV)

Count I sets out race, national origin and ethnicity disparate treatment discrimination claims and Count IV sets out a gender disparate treatment discrimination claim, respectively, under chapter 151B.  When based on indirect circumstantial

evidence of discrimination, Massachusetts courts analyze these types of discrimination under the same, burden-shifting standard.[11]  See Bulwer v. Mount Auburn Hospital, 46 N.E.2d 24, 32 (Mass. 2016) (race and national origin discrimination claims); accord Sullivan v. Liberty Mut. Insurance, Co., 825 N.E.3d 522, 530-31 (Mass. 2005) (sex and age discrimination claims).  As such, counts I and IV are discussed simultaneously below.

Chapter 151B, in pertinent part, states:  "[i]t shall be an unlawful practice:  [f]or an employer, . . . , because of the race, color, . . . [or] sex . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual . . . in terms, conditions or privileges of employment, unless based upon a bona fide occupational qualification."  Mass. Gen. Laws. ch. 151B, § 4.

"[A]t trial, an employee bringing" a chapter 151B claim "must demonstrate four things:  that he or she is a member of a protected class; that he or she was subject to an adverse employment action; that the employer bore 'discriminatory animus' in taking that action; and that that animus was the reason for the action (causation)."  Bulwer v. Mt. Auburn Hospital, 46 N.E.3d at 32 (citing Lipchitz v. Raytheon Co., 751

---

[11]  The facts do not warrant or support a mixed motive analysis and, in any event, plaintiff fails to develop any argument that such an analysis forestalls summary judgment.

N.E.2d 360, 368 (Mass. 2001)).  At the summary judgment stage, as noted above, where, as here, a plaintiff relies on indirect evidence of discrimination, Massachusetts courts typically use "the familiar three-stage, burden-shifting paradigm first set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-805 (1973)." Sullivan v. Liberty Mutual Ins. Co., 825 N.E.2d at 530; Bulwer v. Mt. Auburn Hospital, 46 N.E.3d at 32.  "In the first stage, the plaintiff" must produce evidence of "a prima facie case of discrimination," which would allow a jury to infer that "(1) [s]he is a member of a class protected by G.L. c. 151B; (2) [s]he performed [her] job at an acceptable level; [and] (3) [s]he was terminated." Blare v. Husky Injection Molding Systems Boston, Inc., 646 N.E.2d 111, 115 (Mass. 1995); accord Bulwer v. Mt. Auburn Hospital, 46 N.E.3d at 32-33.  In the second stage, the burden of production shifts to the employer to articulate a "legitimate, nondiscriminatory reason for its employment decision." Bulwer v. Mt. Auburn Hospital, 46 N.E.3d at 33 (brackets omitted).  At the third stage, the burden of production shifts back to the employee to produce evidence that "the employer's articulated justification [for the adverse action] is not true but a pretext." Blare v. Husky Injection Molding Systems Boston, Inc., 646 N.E.2d at 116; accord Bulwer v. Mt. Auburn Hospital, 46 N.E.3d at 33.

Because "'Massachusetts is a pretext only jurisdiction,'"

<u>Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo,</u>
<u>P.C.</u>, 50 N.E.3d 778, 794 (Mass. 2016) (citation omitted), an
employee may survive summary judgment by producing evidence
"that the respondent's facially proper reasons given for its
action against him [or her] were not the real reasons for that
action," <u>Wheelock Coll. v. Mass. Comm'n Against Discrimination</u>,
355 N.E.2d 309, 315 (Mass. 1976), "even if that evidence does
not show directly that the true reasons were, in fact,
discriminatory." <u>Verdrager v. Mintz, Levin, Cohn, Ferris,</u>
<u>Glovsky and Popeo, P.C.</u>, 50 N.E.3d at 794; <u>see</u> <u>Blare v. Husky</u>
<u>Injection Molding Systems Boston, Inc.</u>, 646 N.E.2d at 116;
<u>Lipchitz v. Raytheon Co.</u>, 751 N.E.2d at 367-68.  Such indirect
evidence is sufficient at the summary judgment stage because a
showing of pretext combined with the established prima facie
case "'eliminates any legitimate explanation for the adverse
hiring decision and warrants,' but does not require, 'a
determination that the plaintiff was the victim of unlawful
discrimination.'" <u>Verdrager v. Mintz, Levin, Cohn, Ferris,</u>
<u>Glovsky & Popeo, P.C.</u>, 50 N.E.3d at 794 (quoting <u>Blare v. Husky</u>
<u>Injection Molding Systems Boston, Inc.</u>, 646 N.E.2d 111 at 117).

Defendant does not argue that plaintiff has failed to make
her prima facie case.[12]  Nevertheless, plaintiff meets this

---

[12]  Defendant does state, in conclusory fashion, that, "Plaintiff
Cannot Make A Prima Facie Case of Disparate Treatment On Any

initial preliminary burden.   See Blare v. Husky Injection

Molding Sys. Boston, Inc., 646 N.E.2d at 115.   First, plaintiff

is an Hispanic woman of Dominican descent.   A reasonable juror

could therefore find that plaintiff is within a protected class

as to the discrimination claims based on race, national origin

and ethnicity and in a protected class as a woman with respect

to the gender discrimination claim.   See Village of Freeport v.

Barella, 814 F.3d 594, 607 (2nd Cir. 2016) (discrimination claim

"based on Hispanic ethnicity" may be cognizable as "national-

origin discrimination" and holding "that for purposes of Title

VII, 'race' encompasses ethnicity"); Williams v. Raytheon Co.,

220 F.3d 16, 19 (1st Cir. 2000) (indicating gender is a protected

class "in the sense that every person is in a class protected

against gender discrimination"); Cuello-Suarez v. Puerto Rico

Elec. Power Auth. (PREPA), 988 F.2d 275, 278 (1st Cir. 1993)

(prima facie case established and stating, "Plaintiff's status

as a person of Dominican Republic origin was clear"); Johal v.

Little Lady Foods, Inc., 2004 WL 1745749, at *16 (N.D. Ill. July

30, 2004) ("Valezquez is Hispanic, so she could potentially fall

within the protected categories of national origin and color");

see generally Commonwealth v. De La Cruz, 405 Mass. 269, 272

(1989) ("word 'Hispanic,' ordinarily refers, not to race, but to

---

Basis . . .."  (Docket Entry # 21, p. 12).   However, defendant
does not support this sub-heading with any application of the
prima facie elements to the facts at-hand.

national origin).  Second, given the low evidentiary threshold
at the prima facie stage, plaintiff provided her qualifications
for employment given Ferreira's remarks that she was "generally
good at closing sales."  (Docket Entry # 22-5, p. 4).  Also,
plaintiff was reputed to be polite and a good salesperson
(Docket Entry # 32-4, pp. 8, 11) and Sarno could not recollect
any instance where plaintiff received a verbal or written
warning.  (Docket Entry # 32-4, p. 8).  Third, it is undisputed
that plaintiff suffered an adverse employment action by being
terminated.  (Docket Entry # 22, ¶ 69, p. 12) (Docket Entry #
32, ¶ 69, p. 12).

Moving to the next step of the McDonnell Douglas analysis,
defendant must "articulate some legitimate, non-discriminatory
reason" for plaintiff's termination.  McDonnell Douglas Corp. v.
Green, 411 U.S. at 802.  The defendant employer's obligation at
the second stage is "to produce both 'lawful . . . reasons for
[its] employment decision' and 'credible evidence to show that
the . . . reasons advanced were the real reasons.'"  Bulwer v.
Mt. Auburn Hospital, 46 N.E.3d at 34 (quoting Blare v. Husky
Injection Molding Sys. Boston, Inc., 646 N.E.2d at 115).
Defendant has met its burden of production to show a non-
discriminatory reason for plaintiff's termination, citing
specifically plaintiff's failure to perform essential job
functions like taking sufficient ups.  Defendant also provides

sufficient evidence of plaintiff's overall low and declining sales figures. (Docket Entry # 22-8); see Santiago v. Raytheon Corp., 2011 WL 2945800, at *4 (D.Mass. July 22, 2011) ("[a]s a matter of law, deficient performance is a legitimate non-discriminatory reason for firing an employee").

With defendant's production of a legitimate non-discriminatory cause for the termination, "the burden of production shifts back to" plaintiff "to provide evidence that 'the employer's articulated justification for the termination is not true but a pretext.'" Bulwer v. Mt. Auburn Hospital, 46 N.E.3d at 33 (quoting Blare v. Husky Injection Molding Sys. Boston, Inc., 646 N.E.2d at 116) (internal brackets omitted). To avoid "summary judgment, the plaintiff need only present evidence from which a reasonable jury could infer that 'the [employer's] facially proper reasons given for its action against him were not the real reasons for that action.'" Id. (quoting Wheelock College v. Massachusetts Comm'n Against Discrimination, 355 N.E.2d at 315).

"Because 'smoking gun' evidence is rare, the plaintiff may, and more often than not must, carry his burden of persuasion with circumstantial evidence that convinces the fact finder that the proffered explanation is not credible." City of Salem v. Massachusetts Comm'n Against Discrimination, 693 N.E.2d 1026, 1038 (Mass.App.Ct. 1998) (citation omitted); see Zaniboni v.

Mass. Trial Court, 961 N.E.2d 155, 159 (Mass.App.Ct. 2012).
"'[T]he plaintiff must prove that the explanation given by the
employer . . . lacks reasonable support in evidence or is wholly
disbelievable.'" Metelus v. Wingate Healthcare, Inc., 2014
Mass.Super. LEXIS 29, *12 (Mass.Super. Feb. 28 2014) (citation
omitted). "The fact finder may properly take into account
'weaknesses, implausibilities, inconsistencies, incoherencies,
or contradictions in the employer's proffered legitimate reasons
for its action.'" Id. (citation omitted); accord Abramian v.
President & Fellows of Harvard Coll., 731 N.E.2d 1075, 1085
(Mass. 2000) (proving pretext "may be accomplished by showing
that the reasons advanced by the employer for making the adverse
decision are not true"). "'[I]f the factfinder is persuaded
that one or more of the employer's reasons is false, it may (but
need not) infer that the employer is covering up a
discriminatory intent, motive or state of mind.'" Metelus,
Mass.Super. LEXIS at *13 (citation omitted).

Examples of circumstantial evidence include derogatory or
discriminatory comments made by an employee's supervisors or
managers, see Ahanon v. Cerebral Palsy of Mass., 2005 WL 418598,
*8 (Mass.Super. Jan. 31, 2005) ("[t]he degree of [the comment]
may be a factor, but, again, an 'isolated or ambiguous remark,'
standing alone, is insufficient to prove discriminatory
intent"), statistical evidence, see Lipchitz v. Raytheon Co.,

751 N.E.2d at 373 (statistical evidence may support inference that particular decision was made because of discriminatory animus), and comparative evidence, see Matthews v. Ocean Spray Cranberries, Inc., 686 N.E.2d 1303, 1310 (Mass. 1997) (stating that employee must "identify and relate specific instances where persons similarly situated 'in all relevant aspects' were treated differently").

Plaintiff argues that defendant's reasons for terminating her for poor performance were merely a pretext and not the real reasons for the termination.  (Docket Entry # 33, p. 24). Plaintiff attempts to demonstrate that, prior to her termination, she was considered an overall good employee with monthly sales comparable to the average employee at that branch.[13]  (Docket Entry # 33, p. 25).  In January 2014, the median sales was eight total cars sold and plaintiff sold seven cars.  (Docket Entry # 33, p. 25) (Docket Entry # 22-11).  In February 2014, the median sales was seven cars and plaintiff matched that by selling seven cars.  (Docket Entry # 33, p. 25) (Docket Entry # 22-11).  In March 2014, the median sales was six and plaintiff sold eight.  (Docket Entry # 33, p. 25) (Docket

---

[13]  Two charts with different metrics were entered into evidence to demonstrate plaintiff's sales compared to sales of other employees.  The charts are viewed in the light most favorable to plaintiff, meaning that where plaintiff's sales differ for the same month on the charts, the higher sales figure applies. (Docket Entry # 22-11) (Docket Entry # 22-8).

Entry # 22-8).  In April 2014, the median cars sold was 6.5 and
plaintiff sold four cars before she was terminated on April 18,
2014.  (Docket Entry # 33, p. 25) (Docket Entry # 22-8).
Plaintiff points out that there were no quotas or minimum sales
requirements nor did she receive any warnings regarding her
number of ups and sales.  (Docket Entry # 33, p. 25) (Docket
Entry # 32-2, p. 11).  Three to four times a week, plaintiff
approached customers but Ferreira reassigned the customers
thereby preventing plaintiff from being credited with these
contacts as ups.  Kilvin also assigned customers frequently to
another salesperson and, viewing the record in plaintiff's
favor, rarely to plaintiff.

     The reasons proffered by plaintiff are strong enough to tip
the scales in her favor for purposes of summary judgment.  As
stated, Massachusetts is a "pretext only jurisdiction," meaning
a plaintiff can survive summary judgment by producing evidence
"that the respondent's facially proper reasons given for its
action against him were not the real reasons for that action,"
Wheelock Coll. v. Mass. Comm'n Against Discrimination, 355
N.E.2d at 315, "even if that evidence does not show directly
that the true reasons were, in fact, discriminatory."  Verdrager
v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 50
N.E.3d at 794.  Viewing the record in plaintiff's favor, the
sales figures indicate that plaintiff was an average salesperson

in the months leading up to her termination.  Furthermore,
plaintiff attests to never receiving any warnings for failing to
take a sufficient number of ups (Docket Entry # 22-7, p. 16) and
Sarno confirmed this in his deposition.  (Docket Entry # 32-4,
p. 8).  All of the foregoing as a whole is sufficient evidence
from which a reasonable fact finder could deduce that
defendant's non-discriminatory reasons for termination were a
pretext.

As previously stated, under chapter 151B plaintiff need not
show discriminatory animus to survive summary judgment.  As
explained in Bulwer, "'[i]f the employee were able to prove by
direct evidence that discriminatory animus motivated the
decision, [she] would not have to rely on the indirect method of
proving animus by disproving at least one of the employer's
articulated, nondiscriminatory reasons.'"  Bulwer v. Mount
Auburn Hospital, 46 N.E.3d 24, 33.  Therefore, a showing that
defendant's reasons for terminating plaintiff were a pretext at
the summary judgment stage allows a reasonable fact finder to
infer that plaintiff may have been terminated because of
discriminatory animus.  "The case can then proceed to trial, at
which point, 'if the fact finder is persuaded that one or more
of the employer's reasons is false, it may (but need not) infer
that the employer is covering up a discriminatory intent, motive
or state of mind.'"  Bulwer v. Mount Auburn Hospital, 46 N.E.3d

30

24, 33 (quoting Lipchitz v. Raytheon Co., 751 N.E.2d at 367-68).
The race, national origin, ethnicity and gender disparate
treatments claims pled in counts I and IV therefore survive
summary judgment.

B.   Hostile Work Environment

I.   Standard

In Count I, plaintiff contends that defendant subjected her
to "a hostile work environment" based on her race in violation
of chapter 151B.[14]  (Docket Entry # 1-1).  In Count III,
plaintiff claims she was sexually harassed and therefore
subjected to a hostile work environment on the basis of her
sex.[15]

Chapter 151B provides a cause of action for a hostile work
environment based on the cumulative effect of a series of
abusive acts though each in isolation might not be actionable in
itself.  See Clifton v. Mass. Bay Transp. Auth., 839 N.E.2d 314,
319 (Mass. 2005).  A hostile work environment under
Massachusetts law is one that is "'pervaded by harassment or
abuse, with the resulting intimidation, humiliation, and
stigmatization, [such that it] poses a formidable barrier to the

---

[14]  As previously explained, plaintiff waived the hostile work
environment claim based on race.  This court addresses it to
complete the record inasmuch as defendant addresses the claim in
the supporting memorandum.
[15]  Plaintiff does not raise a constructive discharge claim or
argument that she was constructively discharged.

full participation of an individual in the workplace.'" <u>Cuddyer</u>
<u>v. Stop & Shop Supermarket Co.</u>, 750 N.E.2d 928, 937 (Mass. 2001)
(internal citation omitted).

Whether a work environment is sufficiently hostile to
establish a claim under chapter 151B[16] depends on both an
objective and subjective evaluation such that a reasonable
person would find it hostile or abusive and that plaintiff in
fact did perceive it to be so.  <u>See</u> <u>Thompson v. Coca-Cola Co.</u>,
522 F.3d 168, 179 (1st Cir. 2008) (addressing chapter 151B
discrimination claim).  This court considers all of the
circumstances "in determining whether a work environment is
sufficiently hostile or abusive, including 'the frequency of the
discriminatory conduct; its severity; whether it was physically
threatening or humiliating, or a mere offensive utterance; and
whether it unreasonably interferes with an employee's work
performance.'" <u>Lee-Crespo v. Schering-Plough Del Caribe Inc.</u>,
354 F.3d 34, 46 (1st Cir. 2003) (quoting <u>Harris v. Forklift</u>
<u>Systems, Inc.</u>, 510 U.S. 17, 23 (1993)); <u>accord</u> <u>Belanger v.</u>
<u>Saint-Gobain Indus. Ceramics</u>, 1999 Mass.Super. LEXIS 89, *11
(Mass.Super.Ct. Feb. 24, 1999).  There is no quantitative
requirement or threshold for the occurrence or frequency of

---

[16]  The approach taken by the Massachusetts Supreme Judicial
Court to "hostile work environment" claims brought under the
state statute does not differ greatly from the Supreme Court's
analysis.  <u>See</u> <u>Bourbeau v. City of Chicopee</u>, 445 F.Supp.2d at
113.

incidents necessary to establish the claim.  See Gnerre v. Mass.
Comm'n Against Discrimination, 524 N.E.2d 84, 88-89 (Mass.
1988); accord Noviello v. City of Boston, 398 F.3d 76, 84 (1st
Cir. 2005).

II.   Sexual Harassment Hostile Work Environment (Count III)

Defendant argues that summary judgment should be granted
because a consensual, romantic relationship between two
employees does not, in and of itself, create a sexually hostile
work environment for all other employees.  (Docket Entry # 21,
p. 15).  Defendant further maintains that the claim fails even
if such a relationship could be grounds for a hostile work
environment claim because she cannot prove that the hostile work
environment unreasonably interfered with her work performance or
that the conduct was subjectively offensive to her.  (Docket
Entry # 21, p. 16).  The sexually hostile work environment claim
is based on plaintiff's discomfort with a suspected sexual
relationship between Ferreira and Kivlin.  Plaintiff points out
that the relationship was offensive and resulted in Ferreira's
unavailability during work and hindered plaintiff's sales
capacity.  (Docket Entry # 32-4, p. 10) (Docket Entry # 33, p.
13).

Massachusetts courts have routinely distinguished cases
that were brought by an individual who was directly targeted by
the alleged harasser from cases brought by a third party who was

"significantly removed from the events." Bourbeau v. City of Chicopee, 445 F.Supp.2d 106, 114 (D.Mass. 2006) (addressing sexual harassment under chapter 151B); see Ritchie v. Dep't of State Police, 805 N.E.2d 54, 60 (Mass.App.Ct. 2004). In Bourbeau, the court noted that it knew of "no decision under Title VII or chapter 151B which would extend hostile work environment protection to an employee, like Plaintiff, who simply witnessed such amorous contact between co-workers." Bourbeau v. City of Chicopee, 445 F.Supp.2d at 113 (emphasis added). A case cited by plaintiff, Billings v. Town of Grafton, 515 F.3d 39, 48, 51-52 (1st Cir. 2008), is not to the contrary. The plaintiff in Billings was the primary object of the male supervisor, who repeatedly "stared at her breasts for much of the two and a half years they worked together." Id. at 50.

In this case, plaintiff was never the object of Ferreira's sexual advances or harassment. (Docket Entry # 22, ¶ 38, p. 7). Instead, plaintiff's claim is solely based on Ferreira's alleged affair with another employee, which "was an impairment on her ability to sell vehicles." (Docket Entry # 32-4, p. 10). Because plaintiff was not targeted by the harasser (Ferreira) and simply witnessed, albeit multiple times, his sexual advances and relationship with Kilvin, the sexual hostile work environment claim lacks merit.

The sexual hostile work environment claim is also based on

the fact that Ferreira often used profanities in front of plaintiff, other employees and customers.  The use of profanity alone may not constitute harassment in the workplace, even where those words have "an explicit sexual connotation."  Prader v. Leading Edge Products, Inc., 659 N.E.2d 756, 759 n.2 (Mass.App.Ct. 1996) (plaintiff complained that supervisor referred to her as a "'cocksucker'" and "'a fucking . . .'"); see also Ramsdell v. Western Mass. Bus Lines, Inc., 615 N.E.2d 192, 195-96 (Mass. 1993).  "While the vulgar language was inappropriate to the workplace and completely unprofessional, mere offensive utterances that did not unreasonably interfere with the employee's work performance do not amount to harassment that in essence altered the terms or conditions of [plaintiff's] employment."  Fontánez-Núñez v. Janssen Ortho LLC, 447 F.3d 50, 57 (1st Cir. 2005).  "[A] supervisor's unprofessional managerial approach . . . [is] not the focus of the discrimination laws." Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d at 46-47.

In the case at bar, the "profanities" Ferreira allegedly used in front of plaintiff (such as "What the fuck do you want now?  What do you fucking need?"), although unprofessional and inappropriate to the workplace, do not rise to the level of creating a sexually hostile work environment.  See Prader v. Leading Edge Prods., 659 N.E.2d at 759 ("chapter 151B "does not

mandate 'clean language' in the work place"). Therefore, Count III for sexual harassment is subject to summary judgment.

## III.   Racial Harassment (Count I)

Defendant argues that any hostile work environment claim on the basis of race or color is based on the two "Spanish people" comments. Accordingly, the claim is not remotely sufficient to meet the "severe and pervasive" standard. (Docket Entry # 21, p. 14).

Defendant is correct that the only evidence to support the race-based hostile work environment claim is the two instances where Ferreira made derogatory comments about "Spanish . . . people." (Docket Entry # 22, ¶¶ 29-31, 33, p. 6) (Docket Entry # 32, ¶¶ 29-31, 33). "The flaw in a claim based on a single event, as in this case, is that the underlying conduct does not rise to the level of conduct so persuasive as to create a 'formidable barrier to full participation . . . in the workplace.'" See Burke v. Chatbar, Inc., 2004 WL 3218001, *14-15 (Mass.Super.Ct. Nov. 18, 2004) (citation omitted). A hostile environment claim occurs over time and, "in direct contrast to discrete acts, a single act of harassment may not be actionable on its own." Morrison v. North Essex Cmty. College, 780 N.E.2d 132, 141 (Mass.App.Ct. 2002) (citation omitted).

Here, the comments were infrequent and did not permeate the workplace. Such offhand, infrequent comments do not provide

sufficient evidence for a jury to find in plaintiff's favor
regarding a hostile work environment claim.  See Morin v. Murida
Furniture Co., Inc., 2009 WL 6067021, at *7 (Mass.Super. Sept.
30, 2009) (quoting Faragher v. City of Boca Raton, 524 U.S. 775,
788 (1988)); accord Weeks v. Lower Pioneer Valley Educ.
Collaborative, 2016 WL 696096, at *10 (D.Mass. Feb. 19, 2016);
Navarro v. U.S. Tsubaki, Inc., 577 F.Supp.2d 487, 512 (D. Mass.
2008) (allowing summary judgment on hostile work environment
claim based on "single episode of harassment on the basis of
[the plaintiff's] gender:  the comment by a co-worker about her
dress").

       In short, taking the summary judgment record in the light
most favorable to plaintiff, there is not enough evidence with
which a reasonable jury could conclude that the two "Spanish
people" comments are objectively and subjectively offensive
enough to plaintiff as to create a hostile work environment.
See Thompson v. Coca-Cola Co., 522 F.3d at 179; Morin v. Murida
Furniture Co., 2009 WL 6067021, at *5 (five incidents construed
as sexually suggestive did not constitute an ongoing pattern of
discrimination).  Therefore, defendant is entitled to summary
judgment on plaintiff's hostile work environment/harassment
claim based on race and sex.

C.   Unlawful Retaliation (Count V)
       Plaintiff submits that defendant unlawfully retaliated

against her after she engaged in protected activity by
complaining to management about Ferreira's inappropriate sexual
behavior with Kivlin.  (Docket Entry # 33, p. 21).  Defendant
contends that she cannot show that "'but-for'" the complaints
about Ferreira, she would not have been terminated.[17]  (Docket
Entry # 21, p. 18).

Chapter 151B states that it shall be an unlawful practice:
"[f]or any person, employer . . . to discharge, expel or
otherwise discriminate against any person because he has opposed
any practices forbidden under this chapter or because he has
filed a complaint, testified or assisted in any proceeding under
section five."  Mass. Gen. Laws ch. 151B, § 4(4).  "An employee
bringing a retaliation claim is not complaining of
discriminatory treatment as such, but rather of treatment that
'punish[es]' her for complaining of or otherwise opposing such
discriminatory treatment."  Verdrager v. Mintz, Levin, Cohn,
Ferris, Glovsky and Popeo, P.C., 50 N.E.3d at 800.  Retaliating
against an employee within the protected classes of individuals
by terminating her employment or making her working condition
less favorable falls under the scope of "unlawful employment

---

[17]  Defendant additionally argues that the retaliation based on
her "reporting and/or resisting discrimination and harassment
based upon her national origin/race/color/ethnicity" in Count II
fails because plaintiff admits she never reported the comments
about Spanish people and therefore did not engage in protected
conduct, a requirement of a prima facie case.  As previously
noted, plaintiff's counsel conceded Count II at the hearing.

practice." Mass. Gen. Laws ch. 151B, § 4(17). Chapter 151B "'does not actually use the word "retaliation'" in describing forbidden employment practices." Id. at 799 n.33 (internal citation omitted). "The word 'retaliation' is merely 'shorthand' that '[c]ourts commonly use for. . . the more detailed wordings of antidiscrimination statutes such as'" section 4(4). Id.

To survive summary judgment on a claim of retaliation, an employee must produce evidence from which a reasonable jury could infer four elements. "First, there must be evidence that the employee 'reasonably and in good faith believed that the employer was engaged in wrongful discrimination.'" Id. at 800 (citation omitted). "Second, there must be evidence that the employee 'acted reasonably in response to that belief' through reasonable acts meant 'to protest or oppose . . . discrimination.'" Id. (citation omitted). "Third, there must be evidence that the employer took adverse action against the employee." Id. "Finally, there must be evidence that the adverse action was a response to the employee's protected activity (forbidden motive)." Id.[18]

---

[18] In chapter 151B cases, Massachusetts state courts follow a similar prima facie case and burden shifting analysis as the federal courts in Title VII cases. Parra v. Four Seasons Hotel, 605 F.Supp.2d at 326.

Oftentimes, a plaintiff does not have direct evidence of the fourth element of a forbidden motive.  Verdrager, 50 N.E.3d at 800.  In such circumstances, the employee may rely on indirect evidence using the familiar "three-stage burden-shifting paradigm similar to the one discussed in McDonnell Douglas."  Id.  To establish a prima facie case of forbidden motive (the fourth element of a retaliation claim), "the employee has the burden of producing evidence 'that she engaged in protected conduct, that she suffered some adverse action, and that "a causal connection existed between the protected conduct and the adverse action."'"  Id. (quoting Mole v. University of Mass., 814 N.E.2d 329, 338-339 (Mass. 2004)) (internal brackets omitted).

In the event plaintiff establishes a prima facie case of retaliation, the burden shifts to defendant to articulate a legitimate, non-retaliatory reason for its employment decision.  See Mole v. Univ. of Mass., 814 N.E.2d at 338-339.  If defendant meets this burden of production, the burden shifts back to plaintiff to show that the proffered legitimate reasons are in fact a pretext.  Id.; see Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 278 (1st Cir. 2014) ("at trial, [plaintiff] must show that [she] would not have been fired had [she] not complained").

Turning to the retaliation claim based on reporting the

sexual misconduct, plaintiff submits that she satisfies the
first prong of the prima facie case for retaliation, i.e., that
she engaged in a protected activity, because her complaints
about sexual harassment constitutes a protected activity.
(Docket Entry # 33, p. 21).  The argument may be well taken, see
Hagenah v. Community Enterprises, Inc., 2016 WL 1170963, at *10
(D.Mass. Mar. 23, 2016); Green v. Harvard Vanguard Med. Assocs.,
Inc., 944 N.E.2d 184, 195 (Mass.App.Ct. 2011), but defendant
does not seek summary judgment based on the absence of protected
conduct.  Rather, defendant argues that plaintiff fails to
establish that the complaints about Ferreira concerning sexual
harassment should fail because she cannot show her complaints
were the "'but-for'" cause of her termination.[19]  (Docket Entry #
21, pp. 18-19).  Defendant asserts that plaintiff fails to
establish the necessary "causal link."  (Docket Entry # 21, pp.
18-19).

   As noted above, the prima facie elements require plaintiff
to show, inter alia, that a causal connection existed between
the complaint to management (the protected activity) and the
subsequent termination of plaintiff's employment (the adverse
action).  See Verdrager, 50 N.E.3d at 800; Mole, 814 N.E.2d at
339.  Here, plaintiff argues that this connection exists because

---

[19]   As explained below, this court will assume for purposes of
argument only that a but-for standard applies to this chapter
151B claim.

the temporal proximity between the protected activity and the adverse action (four weeks) is sufficient to infer retaliation. (Docket Entry # 33, p. 23).  Plaintiff further contends that her alleged unfair treatment by Ferreira after complaining to Sarno is evidence of Ferreira's intent to wrongfully terminate her employment.[20]  (Docket Entry # 33, pp. 22-23).  In response, defendant contends "'the mere fact that one event followed another is not sufficient to make out a causal link." (Docket Entry # 21, p. 18); see Mole v. Univ. of Mass., 814 N.E.2d at 339.  Defendant contends that plaintiff cannot show that "'but-for'" her complaints to management she would not have been terminated.  (Docket Entry # 21, p. 18).

    "'The cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'"  Mole v. Univ. of Mass., 814 N.E.2d at 341 (quoting Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)); Mesnick v. General Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (nine month period between filing of complaint and discharge and employee's intervening acts of defiance suggested absence of causal connection); Sánchez-

---

[20]  Instances of Ferreira's conduct are discussed more thoroughly below.

Rodríguez v. AT & T Mobility Puerto Rico, Inc., 673 F.3d at 15 (span of three months between filing EEOC complaint and employer's disciplinary action was sufficient temporal proximity to satisfy plaintiff's burden to show causal connection); Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 25-26 (1st Cir. 2004) (finding span of one month sufficient).

"On a claim of retaliatory discharge, 'unless the termination is very closely connected in time to the protected activity, the plaintiff must rely on additional evidence beyond temporal proximity to establish causation.'"  Mole v. Univ. of Mass., 814 N.E.2d at 341.  "Evidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action . . . can be sufficient to show a causal connection."  Verdrager v. Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 50 N.E.3d at 801 (citation omitted).  "From such evidence, a jury may, though need not, infer that the 'pattern of retaliatory conduct [began] soon after [the protected activity] and only culminate[d] later in actual' adverse action."  Id.  Plaintiff must also show that the retaliator knew about the protected activity because, after all, a retaliator cannot retaliate against conduct of which he is unaware.  See Mole v. Univ. of Mass., 814 N.E.2d at 341 ("it is not permissible to draw the inference that subsequent adverse actions, taken after the employer acquires such knowledge, are

motivated by retaliation").

This court agrees with plaintiff that the four week period
of time between when plaintiff initially complained to Sarno in
mid-March 2014 and when plaintiff was terminated is sufficient
to support an inference of a causal link between the protected
activity and the adverse action.  (Docket Entry # 33, p. 24);
see Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d at 25-26.
Moreover, plaintiff has proffered enough additional evidence
from which a reasonable fact finder could find that her
complaint to management was the "but-for" cause of her
termination assuming, for purposes of argument only, that the
but-for standard applies.  This additional evidence also
establishes and reinforces the existence of a causal connection
between the complaints and the subsequent adverse action, i.e.,
the termination.  First, plaintiff has shown that Ferreira had
knowledge of her complaint to Sarno because Sarno discussed the
complaint with Clay (Docket Entry # 32-4, p. 12) who,
thereafter, had a meeting with Ferreira concerning plaintiff's
allegations (Docket Entry # 22-5, ¶ 30, p. 5).  See Mesnick v.
Gen. Elec. Co., 950 F.2d at 828.  Ferreira denied these
allegations to Clay.  (Docket Entry # 22-5, ¶ 30, p. 5).

Next, plaintiff has shown disparate treatment by Ferreira
following her complaint to Sarno.  See Verdrager v. Mintz,
Levin, Cohn, Ferris, Glovsky and Popeo, P.C., 50 N.E.3d at 801.

44

Specifically, after her complaint about Ferreira to Sarno,
Ferreira:  refused to speak and assist plaintiff (Docket Entry #
22-7, p. 47); diverted customers away from plaintiff (Docket
Entry # 22-7, p. 47); was more accommodating to other employees
who "didn't care" about his relationship with Kivlin (Docket
Entry # 22-7, p. 52); and would turn sales away when plaintiff
sought final approval, which was something that rarely occurred
prior to her complaining to Sarno about Ferreira.  (Docket Entry
# 32-5, ¶ 9).  Ferreira denied certain conduct at his deposition
although he did acknowledge that he knew plaintiff had
complained about his relationship with Kivlin.  (Docket Entry #
32-3).  Although a number of the foregoing facts remain in
dispute, this court is obligated to draw all inferences in favor
of plaintiff as the non-movant on summary judgment.  See Ahmed
v. Johnson, 752 F.3d at 495.

Accordingly, in light of the foregoing, plaintiff
established a prima facie case "that the adverse action was a
response to [her] protected activity."  Verdrager, 800 N.E.3d at
800.  Because plaintiff was able to satisfy a prima facie case
for retaliation, the burden shifts back to defendant to proffer
a legitimate non-discriminatory reason for terminating
plaintiff.  See Mole v. Univ. of Mass., 814 N.E.2d 329, 338-39.
Defendant argues that plaintiff cannot prove the legitimate non-
discriminatory reason is a pretext.  (Docket Entry # 21, pp. 18-

19).  Furthermore, defendant asserts that Ferreira's termination

of Paul Shamon, who had better sales than plaintiff and who did

not complain about discrimination, demonstrates that plaintiff's

poor performance would be sufficient to warrant her termination.

(Docket Entry # 21, p. 19).

Since defendant has proffered a legitimate, non-

discriminatory reason for terminating plaintiff, plaintiff must

show that defendant's reason is a pretext.  See Mole v. Univ. of

Mass., 814 N.E.2d 329, 338-339.  As discussed supra under

plaintiff's sex, race, national origin and ethnicity

discrimination claims, plaintiff has demonstrated that

defendant's legitimate reasons are a pretext because, she was at

the very least, an average salesperson and, inter alia, her

contacts were diverted to other salespeople three to four times

a week.  Therefore, plaintiff has satisfied her burden in

showing defendant's reason was pretextual.

Combining Ferreira's knowledge of plaintiff's complaint,

his subsequent disparate treatment of plaintiff and the temporal

proximity between plaintiff's complaint to management and her

termination, sufficient circumstantial evidence exists from

which a reasonable factfinder could find that she would not have

been terminated but for her complaints to management.[21]  Taking

---

[21]   Again, this court is assuming, for purposes of argument,
that the but-for standard would apply to a chapter 151B

the facts in light most favorable to plaintiff, Count V for retaliation for complaining of sexual harassment survives defendant's motion for summary judgment.

CONCLUSION

In accordance with the foregoing discussion, this court **RECOMMENDS**[22] that the motion for summary judgment (Docket Entry # 20) be **ALLOWED** in part and **DENIED** in part and, accordingly, counts II and III be **DISMISSED** and that the following chapter 151B claims remain in this action:  race, national origin, ethnicity and sex disparate treatment discrimination claims and retaliation based on reporting sexual harassment.


/s/ Marianne B. Bowler
**MARIANNE B. BOWLER**
United States Magistrate Judge

---

retaliation claim.
[22]  Any objections to this Report and Recommendation must be filed with the Clerk of Court within 14 days of receipt of the Report and Recommendation to which objection is made and the basis for such objection should be included.  See Fed.R.Civ.P. 72(b).  Any party may respond to another party's objections within 14 days after service of the objections.  Failure to file objections within the specified time waives the right to appeal the order.